**E-FILED on** 11/5/2007

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CARDONET, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>IBM CORPORATION, et al.,<br><br>　　　　Defendants. | No. C-06-06637 RMW<br><br>ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND GRANTING DEFENDANT'S MOTION TO STRIKE<br><br>**[Re Docket No. 27]** |

　　　Plaintiff Cardonet, Inc. ("Cardonet") pleads the following seven claims in its first amended complaint ("FAC"): 1) breach of contract; 2) promissory estoppel; 3) unjust enrichment; 4) fraud; 5) negligent misrepresentation; and 6) conversion. Defendant IBM Corporation ("IBM") moves to dismiss plaintiff's second through sixth claims. IBM further moves to strike plaintiff's request for punitive damages, claim for attorney's fees, and demand for jury trial. Cardonet opposes both motions, but agrees to withdraw its claim for attorney's fees. For the reasons set forth below, the court denies IBM's motion to dismiss and grants IBM's motion to strike.

## I. BACKGROUND

　　　This action was removed to federal court on the basis of diversity of citizenship. Previously, this court concluded that the choice-of-law provision in the contract between the parties is

enforceable as to all of Cardonet's claims; therefore, New York law applies. Order dated February 14, 2007 Granting Defendant's Motion to Dismiss and to Strike ("Feb. 14, 2007 Order") at 8:10-11, 11:2-10. Thus, the court dismissed plaintiff's claims with leave to amend to replead under New York law, and to replead with particularity under Fed. R. Civ. P. 9 where necessary. *Id.* at 11:4-6.

Cardonet develops and licenses product information management software. FAC ¶ 3. It also provides maintenance and support services for the software. *Id.* IBM develops, manufactures, and sells advanced electronic systems, hardware, and software directly and through third party retailers. *Id.* ¶ 4. On December 23, 2003 Cardonet and IBM entered into a software licensing and maintenance agreement (the "Agreement"), which included two separate documents, a base agreement (the "Base Agreement") and an addendum (the "Addendum").[1] *Id.* ¶ 5. Both referenced IBM contract number 490S3033. Pursuant to the Agreement, Cardonet agreed to grant IBM a license to use 1,385,724 SKUs[2] of Cardonet's software and to provide maintenance and support for such software. *Id.* In exchange, IBM was to pay license fees and software and maintenance fees as set forth in the Agreement. *Id.* Cardonet alleges that it provided considerably discounted prices to IBM for the 1,385,724 SKUs of software based on its belief that IBM and Cardonet would have a long-lasting business relationship. *Id.* ¶ 8. According to Cardonet, this belief was formed based on discussions between the management of both companies and a prior working relationship during which Cardonet provided IBM unlimited use of its software for a 90 day trial period without charge. *Id.*

Cardonet also alleges that when the parties entered into the Agreement, they mutually agreed on a definition of "SKUs" that was consistent with industry practice and the parties' past operating practice. *Id.* ¶ 9. Cardonet provided the 1,385,724 SKUs called for in the Agreement. *Id.* ¶ 6. However, Cardonet avers, between January 1, 2004 and September 2004, IBM repeatedly demanded that Cardonet relinquish additional SKUs to IBM. *Id.*

Sometime before January 1, 2004 IBM encountered technical problems using Cardonet's

---

[1] These documents are attached as exhibits to Cardonet's FAC.

[2] The FAC uses the term "SKUs" as the unit measure for Cardonet's software product. Cardonet prices its software based on usage and measures that usage in "SKUs." *See* compl. ¶ 8.

ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND GRANTING DEFENDANT'S MOTION TO STRIKE—No. C-06-06637 RMW
SPT / TSF                                                   2

software. *Id.* ¶ 10. While assisting IBM with the problems, Cardonet allegedly discovered that the problems were caused by IBM having acquired more than the contractually-agreed upon SKUs of Cardonet's software; IBM had acquired a total of 1,403,149 SKUs at the time. *Id.* Cardonet then informed IBM that IBM had exceeded the contractual limits for SKUs under the Agreement. *Id.* ¶ 11. Cardonet alleges that on January 5, 2004 IBM management informed Cardonet, via email and telephone, that IBM was interested in having at least an additional 3,000,000 SKUs immediately. *Id.* Specifically, Paul Gomes, IBM's Director of Offering Information Management, and William Murphy, IBM's software contracts administrator (and the individual who had previously executed the Agreement on IBM's behalf), promised to meet with Cardonet management on or before October 1, 2004 to discuss and to pay Cardonet for the SKUs acquired in excess of the contractual limit if Cardonet immediately released an additional 3,000,000 SKUs to Cardonet. *Id.* Cardonet then immediately released an additional 3,000,000 SKUs to IBM. *Id.* ¶ 12.

Cardonet alleges that sometime before April 2004 Gomes, Murphy, and another IBM employee, Steve Finely, requested Cardonet to permit IBM to have unlimited access to Cardonet's software, again promising in exchange that IBM would meet with Cardonet on or before October 1, 2004 to discuss and pay for all SKUs acquired by IBM. *Id.* ¶ 13. Cardonet complied with the request purportedly in reliance on IBM's promises. *Id.*

Thereafter, through September 14, 2004, Cardonet repeatedly attempted to set up meetings with Gomes to schedule the promised meeting. *Id.* ¶ 14. IBM allegedly either made no response or promised to discuss the matter at a later date. *Id.* On September 17, 2004 Cardonet wrote to Murphy:

> We need to have resolved this issue prior to October 1. Paul [Gomes] has not gotten back to me and IBM is currently outside of it's [sic] capacity per the contract we signed. I have been trying to get it settled for quite some time now with no luck. W[e] agreed in good faith that Cardonet would allow this to happen (over capacity) as long as we adjusted this by October 1 (and IBM paid any difference that it might owe if they went over their current SKU count–see below for details)[.] Can you provide some assistance.

*Id.* Cardonet also provided its standard list prices for the SKUs in excess of the contracted limit. *Id.*

1    Cardonet alleges that the October 2004 meeting promised by IBM never occurred and IBM
2    never paid Cardonet for the SKUs acquired beyond the amount stated in the Agreement, or for the
3    related maintenance and support fees.[3] *Id.* ¶¶ 15, 18. IBM purportedly has continued to deny it
4    owes Cardonet any additional sums, although it supposedly has not denied it made promises to pay
5    at the time it requested additional SKUs. *Id.* On November 9, 2004 Murphy informed Cardonet that
6    based on IBM's definition of "SKUs" IBM had not exceeded the contractual limit in the Agreement.
7    *Id.* At the time IBM indicated that it was using at least 3,995,781 units of Cardonet's software. *Id.*

## II. ANALYSIS

Dismissal under Fed. R. Civ. P. 12(b)(6) is proper only when a complaint exhibits either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). The court must accept the facts alleged in the complaint as true. *Id.* "A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248 (9th Cir. 1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

Fed. R. Civ. P. 12(f) provides that the court may upon motion by a party "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

IBM moves to dismiss Cardonet's second (promissory estoppel), third (unjust enrichment), fourth (fraud), fifth (negligent misrepresentation), and sixth (conversion) claims for relief. IBM further moves to strike Cardonet's claim for punitive damages, request for attorney's fees, and demand for a jury trial.

### A.   Promissory Estoppel and Unjust Enrichment Claims

IBM argues that Cardonet's promissory estoppel and unjust enrichment claims must be dismissed because they are barred by the existence of a valid, enforceable contract governing the matter in dispute. Under New York law, "[i]t is impermissible . . . to seek damages in an action

---

[3] It is unclear whether Cardonet provided maintenance and support for the SKUs above the total contracted for SKUs.

ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND GRANTING DEFENDANT'S MOTION TO STRIKE—No. C-06-06637 RMW
SPT / TSF                                                4

sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 389 (1987).  IBM contends that the matter in dispute here—the alleged promises to pay for additional SKUs and the transfer of SKUs without additional charge by Cardonet to IBM—is clearly within the scope of the section 3.0 of the Addendum, which states:

> The parties shall meet on or before October 1, 2004 to review [IBM's] capacity usage of the Licensed Work for purposes of determining if additional Fees are due for additional Units used in [IBM] in excess of the Units specified in *Exhibit D* attached hereto.  [IBM] shall not utilize additional Run Time Instances of the Licensed Work without the prior written consent of [Cardonet].

FAC, Ex. A (Addendum) § 3.0.

The court is unpersuaded by IBM's argument.  In *Clark-Fitzpatrick*, the plaintiff sued the defendant for having planned flawed engineering designs which required substantial design changes during construction and for failing to complete certain of its responsibilities under the contract, such as obtaining rights to certain bordering properties and locating and moving utility lines.  70 N.Y.2d at 385.  The plaintiff nevertheless proceeded and finished construction and then sued the defendant to recover damages.  *Id.*  The court concluded that plaintiff could not state a quasi contract claim against the defendant because the disputes of defendant's failure to perform or to adequately perform were clearly within the scope of the contract.  *Id.*  The court so concluded because the contract "contained detailed engineering specifications," *id.* at 385, "fully detail[ed] all applicable terms and conditions, and specifically provid[ed] for project design changes with adjustments in compensation contemplated in light of those changes."  *Id.* at 389.

By contrast, here, the provision of the Addendum upon which IBM relies binds the parties only to an agreement to meet on or before October 1, 2004 to review IBM's capacity usage for purposes of determining if additional fees are required.  Although IBM argues that the Agreement contemplates adjustments in fees for SKU usage changes, nothing in the Addendum (or Agreement)

provides for the payment terms or fees that must be paid if IBM exceeded the contracted usage.[4] Rather, the contract sets forth pricing and fees only for the 1,385,724 SKUs, 40 source catalogs, 40 output channels, and 2 run time instances. FAC, Ex. B (Addendum) at Ex. B[5]. Although Cardonet alleges that IBM also ignored its request to meet by or before October 1, 2004, Cardonet also alleges that IBM, by making promises to pay for more SKUs, induced Cardonet to permit up to unlimited access to its product. Therefore, the court finds that the dispute is not clearly within the scope of the Agreement. Accordingly, the court concludes that Cardonet's quasi contract claims are not barred by the existence of a valid, enforceable agreement.

### B. Tort Claims

IBM moves to dismiss Cardonet's tort claims on two grounds. First, IBM argues that these claims are barred because they do not arise from a duty independent of the obligations imposed by the Agreement.[6] IBM argues that Cardonet's tort claims basically allege that IBM falsely promised to or negligently misrepresented its intent to perform under the contract. Therefore, IBM contends, any alleged wrongdoing relates only to non-performance of duties under the Agreement. Second, IBM argues that the tort claims are barred by the economic loss rule.

#### 1. Contractual Duty

Under New York law, a "plaintiff's tort claim must allege a breach of a duty that 'spring[s] from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.'" *Carmania Corp., N.V. v. Hambrecht Terrell Int'l.*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989) (quoting *Clark-Fitzpatrick*, 70 N.Y.2d at 389)).

---

[4] IBM argues that the absence of pricing is irrelevant because such a missing term does not render a contract indefinite. However, the issue in this motion to dismiss is not definiteness or validity of the Agreement, but whether the dispute, as alleged, is clearly within the scope of the contract. IBM also argues that § 3.0 of the Agreement encompasses the dispute of whether or not IBM's actual usage exceeds the contractual limit and requires additional fees. However, this argument requires the court to interpret the provision broadly and in IBM's favor, which the court declines to do on a motion to dismiss.

[5] Cardonet attached the Addendum as Exhibit B to its FAC. The Addendum also contains its own Exhibit B which sets forth "Pricing and Fees."

[6] IBM does not argue that Cardonet has not pled its fraud claim with particularity as required by Fed. R. Civ. P. 9 or that the claims fail because Cardonet has not alleged facts supporting the elements of these claims under New York law.

However, New York law allows "concurrent recovery in tort and contract so long as a defendant violates distinct legal duties: one that arises from the contract at issue, and one that arises independently." *Id.* Here, Cardonet alleges that after the total SKUs permitted by the Agreement had been used by IBM and Cardonet had so informed IBM, the parties had separate discussions during which IBM requested more SKUs while promising to meet with Cardonet by October 1, 2004 and to pay additional fees for SKUs in excess of capacity. Cardonet alleges that, relying upon those statements, it permitted IBM to have access to an additional 3,000,000 SKUs and, eventually, to have access to unlimited SKUs. Thereafter, Cardonet alleges, IBM ignored requests to meet and unilaterally informed Cardonet that there has been no excess usage of SKUs and no additional fees were due. Taking inferences of these factual allegations in the light most favorable to Cardonet, IBM's alleged statements extend beyond a mere promise to perform under the contract.

As discussed in section A, *supra*, the contract provides for payment for the contracted number of SKUs and for a meeting by October 1, 2004 for further discussions, but made no provisions for the fees and payment terms for SKUs above the contractual limit. The basis for Cardonet's claims is not limited to contract performance as IBM suggests, but stems from IBM's promises to meet and pay additional fees after being informed by Cardonet (and not disputing) that the contractual limit had been reached. That these allegations are related to or factually similar to Cardonet's breach of contract claim does not bar the claims. *See Carmania Corp.*, 705 F. Supp. at 938 n.1 ("If a defendant owes a plaintiff a legal duty independent of contract, he is liable in tort for breaching that duty no matter how similar the factual allegations underlying the contract claim."). Here, IBM's statements extend beyond a promise to perform under the Agreement and give rise to a separate legal duty based on false statements or misrepresentation which allegedly induced Cardonet to grant access to more SKUs. Accordingly, the court concludes that Cardonet's claims for fraud and misrepresentation arise from a duty independent of the obligations imposed by the contract. The court also notes, however, that although Cardonet may go forward with its tort claims, there does not appear to be any allegation of a measure of damages separate from what Cardonet seeks under its quasi contract claims.

**2.    Economic Loss Rule**

New York's economic loss doctrine restricts plaintiffs "who have suffered 'economic loss,' but not personal or property injury, to an action for the benefit of their bargain. If the damages are the type remedial in contract, a plaintiff may not recover in tort." *Carmania Corp., N.V. v. Hambrecht Terrell Int'l*, 705 F. Supp. 936, 938 (S.D.N.Y. 1989); *see Long Island Lighting Co. v. Transamerica Delaval*, 646 F. Supp. 1442, 1457 (S.D.N.Y. 1986) (noting that a tort action for economic loss is inappropriate).

However, "the 'economic loss rule' does not extend to prohibiting a suit by a party in privity for pecuniary losses suffered as a result of breach of a duty independent of the contract." *The Limited, Inc. v. McCrory Corp.*, 169 A.D.2d 605, 607-08 (N.Y. App. Div. 1991). In *The Limited*, the plaintiff alleged it was in privity with the defendant pursuant to a stock purchase agreement. *Id.* Nevertheless, the court concluded that because the plaintiff had also asserted a duty independent of the contract, the plaintiff stated a viable negligence claim for pecuniary losses. *Id.* As discussed in section B.1, *supra*, the court concludes that plaintiff has alleged tort duties independent of the parties' contractual obligations. Because such duties are independent of the contract between the parties, plaintiff's alleged damages, although pecuniary, are not limited to the benefit of the bargain under the Agreement. *See Stell Mfg. Corp. v. Century Indus., Inc.*, 15 A.D.2d 87, 89-90 (N.Y. App. Div. 1961) (rejecting respondents' argument that "where a contract is the source of a relationship between the parties, torts committed in the course of and made possible by such relationship should be protected from independent attack, and the limit of recovery be restricted to damages for breach of such contract").

### C.     Motion to Strike

IBM moves to strike plaintiff's request for attorney's fees. In its opposing brief Cardonet withdrew its claim for attorney's fees. Accordingly, IBM's motion to strike the claim for attorney's fees is granted as unopposed.

IBM also seeks to strike plaintiff's demand for punitive damages. Under New York law, punitive damages may be granted in private fraud claims if the claims involve "wrongdoing directed at the general public or egregious culpable conduct." *The Limited*, 169 A.D.2d at 608. A plaintiff must allege fraud "evincing a 'high degree of moral turpitude' and demonstrating 'such wanton

dishonesty as to imply a criminal indifference to civil obligations'" and must allege that the "conduct was 'aimed at the public generally.'" *Rocanova v. Equitable Life Assur. Soc. of U.S.*, 634 N.E.2d 940, 943-44 (N.Y. 1994) (quoting *Walker v. Sheldon*, 179 N.E.2d 497, 498-99 (N.Y. 1961)). Cardonet seeks punitive damages for its fraud and conversion claims. Because Cardonet's allegations of IBM's purported conduct for these claims do not involve the requisite high degree of moral turpitude or wanton dishonesty and conduct aimed at the public, the court strikes its demand for punitive damages.

IBM argues that the demand for jury trial must be stricken because the Agreement expressly waives "any right to a jury regarding disputes related to this Agreement." FAC, Ex. A (Base Agreement) § 14.3. IBM contends that all of Cardonet's claims are disputes related to the Agreement. Cardonet does not dispute the provision is set forth in the Agreement, but argues that only its breach of contract claim is "related to" the Agreement. Although the court concluded that the quasi contract and tort claims are separate from Cardonet's breach of contract claim, these claims are nevertheless sufficiently related to the Agreement to fall within the scope of § 14.3. Accordingly, the court grants IBM's motion to strike the demand for jury trial.

### III. ORDER

For the foregoing reasons, the court denies IBM's motion to dismiss and grants IBM's motion to strike.

DATED: 11/5/2007

*Ronald M Whyte*

RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

| | |
|---|---|
| Kenneth N. Frucht | Kfrucht@aol.com |
| Frederick J. Geonetta | landglawyers@msn.com |
| Thomas Marc Litton | tmlitton@compuserve.com |

**Counsel for Defendants:**

| | |
|---|---|
| Shon Morgan | shonmorgan@quinnemanuel.com, amykuzio@quinnemanuel.com |
| Joseph Mel Paunovich | joepaunovich@quinnemanuel.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**     11/5/2007                                   TSF
                                                **Chambers of Judge Whyte**

**United States District Court**
For the Northern District of California

ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND GRANTING DEFENDANT'S MOTION TO STRIKE—No. C-06-06637 RMW
SPT / TSF                                                              10